May it please the court, I am Joshua Glellen appearing on behalf of Mr. Rabinowitz, the attorney for the claimants in these two cases whose fee requests were drastically cut by the same administrative law judge, indeed in one of the cases it is the same administrative law judge who had originally denied the claim and it required Mr. Rabinowitz's trip to this court to get that overturned on the ground that it was patently unreasonable. That judge I think has rather evidently taken some revenge on Mr. Rabinowitz in this case and many others. This is one more... That's a little strong to say, I mean I don't think we need to get into issues of properly weighed and discounted the evidence that he had presented and then examined other evidence in setting the rates. Why don't you address that? I fully agree your honor, yes. What the ALJ did here is the same thing that the court condemned in the Christensen decision and since then has reversed ALJs in several other cases including those in which Mr. Rabinowitz was the attorney in question. The ALJs consistently and this ALJ in particular but the others in the San Francisco office as well consistently reject all evidence submitted in support of a requested rate. All evidence discounted and the ALJs then go on their own and rely on previous ALJ fee awards under the Longshore Act. This is exactly the self-referential enterprise condemned in Christensen. You know Mr. Gilleland, I think you're presenting two different lines of argument and I'm not sure you know how they intersect. One is that the ALJ and the BRB's decision was not a reasonable determination of fees. But the second one is somehow that you know you're talking about the improper line of cases that she's done this again and again. I think you're making an argument of some kind of a prejudicial bias or improper motive. You think that's a basis for overturning the fee award if it's otherwise reasonable? No, I do not and I do not mean to suggest that that is a reason. Well, then why do you pursue that? The question is what was the evidence, right? And you know how did the ALJ and the BRB construe it and you know I mean was that supported by substantial evidence? Is that the issue? No, I mean it's not an issue where you know time and again and time and again you know she did the same thing and you went back to her old. It doesn't seem to be you know focused on the issue we have to decide. I understand, I understand completely. My point is that the ALJs in these cases and in other cases as well, even when the rate requested is supported by a variety of evidence, not only the attorney's affidavits but other affidavits from other attorneys who know that local market. ALJs reject it despite the fact that the employers in these cases and the others never submit any evidence to the contrary with respect to what the market rates in the relevant market are. That's just what happened here. The court has said that when the petitioner for fees submits some satisfactory evidence beyond the attorney's own affidavits in support of the claimed rates, that is enough in itself to transfer to the party opposing the fees the burden of facing evidence, counter evidence on what the market rates are. Are you relying on a Danger Circuit case that says that? Yes, I am. I believe Moreno is the case and perhaps Welch as well, where the court, I believe I quoted accurately, some satisfactory evidence in addition to the attorney's own affidavits of what local market rates are. And Mr. Rabinowitz submitted evidence in each of the categories of satisfactory evidence that the court referred to there. Um, once again, the ALJ, instead of casting a burden on the employer to show something to the contrary, reached out on her own and ended up in one of these cases awarding a rate lower than what the employer had argued for. What does the record show about what whether or not Mr. Rabinowitz has any practice outside of the Longshore area? It shows also his representation of claimants in Admiralty civil tort cases, including cases before the district court and cases before this court, outside of the Longshore Act context and civil Admiralty court damages and Jones Act cases. And what did that show about his rates? Um, well, the rates in those Admiralty tort cases are, of course, typically contingent fees. So there's no rate that he charged his clients in those cases. In fact, the record shows I don't believe it shows any rates he has charged paying clients because that's not what his practice is. Practice is contingent fees in tort actions and court awarded fees. Actually, there's a, an Oregon workers' compensation case in which he was awarded fees far higher. He has no direct evidence of a market rate, what the hourly rate that the market will pay for his services. That is correct. That's recognized in Christensen. That will always be true of Longshore Act specialists. They have no market rates tested by their ability to attract paying clients because their practice does not include paying clients and they are not permitted. Let me ask you about your about your last statement. You talked about, you know, Longshore specialist. Does the record show that Mr. Rabinowitz spent 50% or more of his time on Longshore matters? Yes, I'm sure it does. Yes. You're sure it does? Can you cite me? No, I cannot. Mr. Rabinowitz's fee applications in each case would detail his curriculum VD, which included a top tier law school and a clerkship for the Southern District of New York. That starts him in the top 5% before he even goes into the private sector. But the ALJ, after almost 50 years, put him in the 25th percentile. How many how many lawyers are there that that that have greater than 50% of their practice Longshore in the Portland area? Oh, in the Portland area, I would suggest about four. But I couldn't stand to be corrected on that. Very small. If it's four and he's and he's in the top 25 percent, that would make him number one, wouldn't it? Yes, it would. He is certainly by far the most experienced and in my view, the most expert Longshore practitioner in the area. When we look for the top 5%, are we are we looking only at the market in which Mr. Rabinowitz practices or do we get to look at a larger market? Well, he does not practice. I mean, if you mean local market, no, we have to go with the Portland area market. OK, I mean, so we're looking for if we're looking for top 5% in the local market, that's where we're looking for the top 5%. Yes, correct. OK. And in fact, I would say the top 5% and Mr. Rabinowitz argued in the ALJ did not really address the point. I would argue the top 5% of those who've been practicing for more than 30 years, that he is so far beyond the top category of experience. Mr. Mr. Ghalelan, do the do the surveys that were used in this case, you know, the the the Oregon State surveys and the more focus surveys, do they break down the fees between, you know, we'll say, you know, the top 10% lawyers charge more than the rest of the market or if you know what I mean, like, like, we'll say, just take as a hypothetical example, commercial litigation attorneys. All right. Yeah. Do the top 10% charge more than the rest of the of that bar? I mean, do the surveys, do the surveys show that? Yes, the surveys break it down that way. Yes, they do. Although there are brackets of experience levels that do not go anywhere near as high as no, no, wait a minute. Experience. Are you saying placement in the percentile is based only on experience, not results? No, no, it's for each experience bracket, the survey breaks it down into the percentage, the rate for an attorney in the 25th percentile by rate, not by experience or by skills or anything else, but by rate, the top 25%, the top 10%, the median and the lower 25%. Well, each experience level. But the ALJ did not use the experience level that Mr. Rabinowitz is in. She simply placed him in the top 25% of all attorneys in the various compared him with attorneys in the 25th percentile of attorneys in each of the several practice areas she considered, which included general litigation, despite the fact that generalists are not as well paid as specialists is an overarching principle, and yet she did not use any specialist rate. If the court does not have any immediate questions, I would reserve the remainder of my time for rebuttal. All right, thank you very much. We will hear now from Mr. Godfrey. Thank you. Good morning, your honors, and may it please the court. My name is Michael Godfrey, and I represent Moonstone Towboat Company and their Carrier Safe, along with Brady Hamilton Stevedore Company and their Carrier Safe. Both employers and carriers respectfully ask this court to affirm the board's decision, which would affirm the ALJ's decisions regarding the attorney fee in Wheatley was an $80 difference in attorney rate, and it was based on a miscalculation in inflation that had been stipulated to or conceded by the employer in briefing to the benefit review board. In each case here, the ALJ's hourly rate determinations were reasonable. There's no evidence in the record to suggest that there was an error of law or abuse of discretion. Well, in Christianson, you know, we criticize this idea of court-established rates, and, you know, going through the order where, you know, the judge assembles the chart of what everyone else is doing for the petitioner's rate and using that as a reference, it sure looks like we're getting a court-created rate sheet, doesn't it? I can see how that could be inferred, Your Honor, but I think that, and if you look closely at Judge G's charts in both Seacrest and Wheatley, she was, I think, listing the charts more for an idea of what the percentile placement the judges had put Mr. Rabinowitz in for each of the cases. And I think ALJ quoted this, or at least said this, and I thought it struck me as well said, was prior decisions aren't, they're part of the constellation of data points that a judge has in terms of evaluating what information to consider when creating a proxy market rate. Christianson didn't bar the use of, or consideration of prior determinations, it just said that that shouldn't be the only factor. I think that that's what the ALJ did in this case. The other thing that's striking about the chart is, at least in the Seacrest case, the last entry involves the board's award in connection, I guess, with the prior appeal, and the rate is a lot higher than was subsequently given here. How do you explain that? Well, I think that the board in that case placed Mr. Rabinowitz in the 95th percentile, and I think the board has its own discretion in determining whether Mr. Rabinowitz practiced in that area. Did his career take a turn for the worse in the subsequent years that he dropped, or what's the basis for that change? I don't think there is a basis for the change. I think that every fact finder has some amount of discretion to look at the evidence that's submitted on behalf of the petitioner, look at their own experience involving the petitioner, and then look at how other judges have viewed the petitioner and made the determination as to where they would place him in that market. I think one of the questions that you asked Judge Breivy is whether it's the local community or the local market for determining the bracket for the percentiles, and I think that I would argue that the standard is the relevant community, and so the ALJs that handle long-short cases, they're handling cases in Portland, they're handling cases in Seattle, they're handling cases in San Francisco, and while there are the market rate for Mr. Rabinowitz is best looked at through the lens of the local Portland market, in terms of the long-short community, I think that I would argue that the relevant community for determining what is a top 5% attorney versus a top 25% attorney, looking at what else is done throughout the district is certainly important. So I think that that's hopefully that clears that up a little bit. The other thing I wanted to, was there a question? One of the things that I wanted to discuss was the standard of review. In the briefing, petitioners argued that the entire determination regarding whether the judge disqualified the submissions from petitioner was a de novo review, and I think that's partly true, but if you look at the judge's decision, what she's done is she's gone exhibit and examined each piece of evidence for relevancy to a market rate and determined that they weren't relevant, and if you look at this case, and again the other cases that I cited in my brief, I agree with the petitioner that they're not binding in any way, but I think they are relevant as a persuasive source of Mr. Rabinowitz continues to submit the same exact exhibits, case after case after case, even though the judges have determined that they're not really relevant to establishing a market rate. So in that regard, the standard of review should be abuse of discretion. Another thing that I wanted to talk about, your honors, was that the timeline in this case is important. In 2015, I believe, on December 31st of 2015, this court issued the Sherrod decision, and in the aftermath of Sherrod, the ALJs issued a significant amount of attorney fee orders that followed the holding of Sherrod very closely, and in those cases, the judge, in both of these cases, the judge has defined the relevant community locally in Portland. They've gone through a methodology for a proxy rate in a manner consistent with Sherrod and Christensen. They properly accounted for the inflation using a variety of tools. In this case, it was the CPI for the Portland-Salem market. So I think that if you look at the timeline, the judge's decision in these cases makes sense because they're following this court's instructions in terms of how to view the evidence, what evidence is relevant in determining whether a petitioner meets their burden of proof in establishing a market rate, and if they haven't established a market rate, what considerations are used for determining that proxy market rate. And I think it's noteworthy in this case that if Judge Gee had determined that Mr. Rabinowitz was in the 95th percentile, it would have been very close to the rate that he had wanted. It would have been off, I think, maybe $15, if my quick mental math is correct here. What these cases boil down to, and what the Nelson case boils down to, and Hartman and all the cases that Mr. Rabinowitz continues to appeal is that he's not happy being placed into the 75th and as the ALJ discussed in her decision, there is a very long and detailed history about why he is better placed into the 75th percentile rather than the 95th percentile. One of the things that my esteemed opposing counsel mentioned was that he graduated from a top-tier law school and has many years of experience, but those aren't the only considerations a judge makes or the only factors that a judge has to consider when determining someone's place in the market and where they would rank relative to their peers. If you look at the methodology for the 2012 OSB survey, they looked at plaintiff civil litigation for personal injury, plaintiff civil litigation for non-personal injury, and plaintiff general civil litigation to calculate a proxy rate. Importantly, they didn't use the workers' compensation rate information in the survey because that was outlawed in Sherrod. The argument can be made that the Longshore Act is a national workers' compensation act for employees. I want to ask you a question about one of the things the ALJ did. Now the ALJ rejected the primary survey that Rabinowitz presented, right? Correct. And one of the reasons was that while it's out of date, it's too old. But it was, you know, but at the same time, she used, you know, a somewhat outdated survey herself and all she did was, you know, update it, right? Updated it for inflation. Now, why couldn't you do the same thing to the survey Rabinowitz that presented, updated it for, you know, inflation? Your Honor, I don't think that there's any reason that that couldn't have been done, but I think that the reason that that survey, and I think there was more than one survey, but I'm assuming you're talking about the Maroon survey or the Markowitz affidavit, which was in both cases, was that they had a lot to do with commercial litigation, and she had significant concerns about what firms were included in that information and how vastly different they were than the type of work that Mr. Rabinowitz was doing. And she thought that the... Well, all right, all right. Let me ask you another question. It's pretty clear, at least to me, that, you know, the records sufficiently show that maybe you can almost take notice of it, but that Rabinowitz is a specialist in, you know, Longshore Act cases. Do you challenge that? No, I don't think that there's any dispute to the fact that Mr. Rabinowitz is a specialist in Longshore cases, I think, and in Longshore trial work, but I think that as everyone agrees, there's no dispute that there's no market rate for Longshore attorneys. And so, well, what I'm getting at is, you know, besides using the rates for whatever it was, personal injury lawyers or commercial injury lawyers, the ALJ also then included the general practice. Now, the general practice is specifically for attorneys who don't specialize, and the only effect that had was to lower the rate. Now, why should you have to use the general practice for, you know, for a recognized specialist? I think that in absence of a market rate for a specialty looking at what a general practice does is a factor, and I think that the discretion that we afford administrative law judges is we say, here's, you know, the X amount of factors that you can consider. You can consider the evidence presented by petitioner if it's relevant and persuasive to a market rate, and if it's not, then, you know, the Oregon State Bar has been verified, and I think this court in the District of Oregon both said the Oregon State Bar is a reliable source of information. In fact, in Sherrod, I think it was footnote seven, they said they had no reason to doubt the reliability of the data in the Bar survey, and so what the judge's task of doing is taking information in the Bar survey and extrapolating all of the data out of that and to determine a proxy market rate, and I think I would note that the judge didn't use the workers' compensation information in the Bar survey, which would have, in fact, lowered it quite a bit because, you know, for whatever reason, in Sherrod, the workers' compensation information was deemed not relevant to the local community, and so I think that that's sort of the discretion we give our judges in saying what information do you find persuasive in the local exhibits that are submitted by petitioner and are available for consideration. Okay. I only have about 20 seconds left, Your Honor, but I wanted to point out that I think that the action in this case was condemned by petitioners was what Mr. Gillelan said during his opening, and I believe that that's not true because Christensen just indicated that total reliance on prior ALJ was inappropriate. All right. Thank you, Counselor. Your time has expired, so we'll hear a rebuttal from Mr. Gillelan. Thank you. First of all, I think there is a notable contrast between the rates that, as set forth in Mr. Rabinowitz's fee application, have been awarded to him by this court, by the Benefits Review Board, by the District of Oregon, and by the Oregon State Courts have all been supportive of the rates that he claimed from the ALJ in this case. I think that shows that something is amiss, and a second thing that shows that something is seriously amiss with the entire way the ALJs approach these questions is that we have these 63 and 40-page single-space, 12-point decisions on attorney fees of well under $100,000. This is obviously a grotesque misuse of resources when the ALJs are sitting on cases in which the claimants are claiming permanent total disability or survivorship from a death of a maritime worker, and they wait for two or three years for these ALJs to issue decisions. Because they're spending this kind of time on attorney fee decisions at their own instance when the employers, once again, as here, have submitted absolutely no evidence to counter the evidence submitted in support of the claimed rates. Now, the generalist rates that the ALJ included certainly pull the rate down from what it should be, but even beyond that, where we start out is with affidavits, several surveys, past fee awards by tribunals other than the ALJs, all supporting the claimed rates, the employer submitting no contrary evidence, no evidence, for example, that the rates surveyed in the Burge and Moroney surveys were not comparable work. There's no evidence that longshore work is not comparable to commercial litigation. No evidence at all. This is the ALJs' submission. But is there evidence that it is comparable? Yes, there absolutely is. The affidavits of the expert who opined that, yes, those rates for the commercial litigation rates in the survey were for work comparable to what Mr. Rabinowitz had done in these cases. The fee expert had reviewed what his work was and opined, yes, this is work that's worth the amount that he's claiming for. And the ALJ gives that no credence because she thinks, with no evidence to support it, she thinks that it's not comparable work. Again, the central point is, and we can reduce all of these fights by recognizing that, as this court has said, when the fee petitioner submits some satisfactory evidence beyond his own mere affidavits and specifies the sorts of satisfactory evidence that should suffice, when that is submitted, the burden is on the employer to submit contrary evidence about the relevant market. Thank you, counsel. Your time has expired. The case just argued will be submitted.
judges: Tashima, Bybee, Collins